UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**MELVIN PORTER CARSON**                                                                                                             **PLAINTIFF**

v.                                                                              **CIVIL ACTION NO. 3:22-CV-P193-JHM**

**COOKIE CREWS** *et al.*                                                                              **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion for summary judgment by Defendant Amanda Harper (DN 19). This matter is ripe for decision. For the following reasons, Defendant's motion will be granted.

**I.**

Plaintiff initiated this *pro se* 42 U.S.C. § 1983 prisoner civil-rights action based on events that occurred soon after she was transferred to Roederer Correctional Complex (RCC) from Kentucky State Penitentiary as a general population inmate. Upon initial review of the verified complaint pursuant to 28 U.S.C. § 1915A, the Court allowed a Fourteenth Amendment equal protection claim to proceed against Defendant Harper, a correctional officer at RCC, in her individual capacity, based upon Plaintiff's allegations that she conducted "targeted" searches of Plaintiff's bed area once she learned Plaintiff identified as transgender.

**II.**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the

moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *6-7 (6th Cir. May 5, 2010) (citations omitted). The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter" its burden of showing a genuine issue for trial. *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Yet statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

### III.

In Defendant's motion for summary judgment (DN 19), she argues that the motion should be granted because she did not violate Plaintiff's right to equal protection under the Fourteenth Amendment and because she is entitled to qualified immunity. With regard to the first argument, Defendant argues that Plaintiff's claim fails because the two searches of her bed area and subsequent seizure of some of her personal property were warranted under the institution's rules and because Plaintiff has failed to establish that any inmates, "much less any non-transgender inmates in the unit where Plaintiff was housed," were permitted to possess "non-allowable" items. Defendant attached her own affidavit in support of the motion (DN 19-2).

In Defendant's affidavit, she states that on August 2, 2021, she was assigned to a security post in the Assessment and Classification Unit ("AC Unit") where Plaintiff was housed.[1] (DN 19-2, ¶ 7). She avers that on this date she noticed Plaintiff with what appeared to be a cigarette in her hands. (*Id.*). Defendant continues:

> Because cigarettes are considered to be contraband, I asked [Plaintiff] what the object was, and she responded that it was a paper mache cigarette she made in arts and craft. This item was not allowed in the [] Unit. At that point, I looked to the far end of the dorm and noticed an improvised shoe-string clothes line strung up on [Plaintiff]'s bunk. This too was not allowed. At that time [two other officers] and I decided to search [Plaintiff]'s bed area.

(*Id.*).

Defendant states that as a result of the search, they seized a hot pot, a television, and an altered coat because inmates were not allowed to possess these items in the AC Unit.[2] (*Id.* at ¶12).

---

[1] Neither party disputes that upon transfer to RCC as a general population inmate, Plaintiff was required to quarantine for COVID-19 in an AC Unit instead of being directly transferred to a general population dorm. The AC Unit at RCC normally houses prisoners entering the Kentucky prison system for the first time so that these prisoners' security classifications and rehabilitative needs can be determined. Prison officials then use this information to determine a prisoner's proper placement in the Kentucky prison system. (DN 19-2, ¶ 3).

[2] Although not pertinent to the resolution of the instant motion for summary judgment, according to Defendant, the confusion over whether Plaintiff was in rightful possession of certain property stems from the fact that Plaintiff was transferred to RCC as a general population inmate and that general population inmates are allowed to have a certain

3

She also avers that she confiscated Plaintiff's MP 3 Player on August 4, 2021, after she found another inmate using it. She states that she seized the MP 3 Player because it violated an institutional rule which bars inmates from being in possession, for whatever reason, of property belonging to another inmate. (*Id*. at ¶ 13). She states that this incident prompted her to call a deputy warden to clarify what inmates were allowed to possess in the AC Unit and he informed her that quarantined inmates in the that unit should only possess the same items allowed by regular inmates in that Unit. (*Id*. at ¶ 15). She then avers that the deputy warden directed her and another officer to "confiscate and inventory all of [Plaintiff]'s items that were not regularly allowed in the that unit and to place those items in the property room until Plaintiff was released from quarantine and placed in a general population dorm." (*Id*.).

In Plaintiff's response to the motion for summary judgment (DN 20), Plaintiff argues that Defendant violated institutional rules when she twice searched Plaintiff's bed area and seized some of her personal property and that Defendant is not entitled to qualified immunity.[3]

In Defendant's reply (DN 21), she argues that Plaintiff does not dispute that she was found in possession of numerous items not allowed to be possessed by inmates in the AC Unit. She also reiterates her argument that Plaintiff has failed to show that she was treated differently than other inmates to whom she was similarly situated.

---

amount of personal property under institutional rules. Inmates in the AC Unit, however, are very limited in the amount and type of items they may possess. (*Id*. at ¶ 5). Defendant states that both prison guards and inmates were confused about what property a general population inmate should be allowed to possess while quarantining in the AC Unit. (*Id*. at ¶ 9).

[3] In its initial review of this action, the Court dismissed Plaintiff's claims sexual harassment claims. According to the complaint, Plaintiff's allegations of sexual harassment occurred before Defendant Harper learned that Plaintiff was transgender. Thus, to the extent Plaintiff makes any argument regarding these allegations in her response or supplemental response to Defendant Harper's motion for summary judgment, the Court disregards them. The Court also dismissed Plaintiff's claims regarding a Prison Rape Elimination Act ("PREA") complaint and investigation. Thus, her continued references to these claims will also be disregarded.

Plaintiff filed a sur-reply in which she made several new allegations (DN 23).  However, the sur-reply was not verified.  Thus, the Court entered an Order in which it provided Plaintiff guidance on how to respond to a Rule 56 motion for summary judgment and allowed Plaintiff to file a supplemental response to the motion.  In Plaintiff's supplemental response (DN 27), she reiterates that the evidence shows that Defendant's motive for conducting the search was improper and that Defendant was motivated, at least in party, by Plaintiff's gender identity; that Defendant is not entitled to qualified immunity; that homosexuals are members of a protected class; that other staff allowed Plaintiff to have the personal property that was seized and it was not until Defendant learned Plaintiff identified as transgender that she took the property; and that Plaintiff was in rightful possession of the property she possessed.

In her affidavit (DN 27-1), Plaintiff avers that on August, 2, 2021, "Defendant witnessed me applying eyeliner to my eyes and she immediately looked angrily at me.  Shortly thereafter . . [Defendant] ran into the wing and told me 'give me that' and I gave her an arts and crafts object that I had made using allowable items . . . ." (DN 27-1, p. 2).  She then states that Defendant and another officer "came back in into the wing where she was playing cards . . ., went to my bed area and cut down a clothing line that the staff had had previously allowed me to construct my dry clothes on." (*Id.*).  Plaintiff further states that on August 4, 2021, another officer asked her "why [Defendant] had begun to target me . . . and I stated to [the officer] that 'I think she is upset because I am trans." (*Id.* at p. 2).

In Defendant's supplemental reply (DN 28), she reiterates her position that Plaintiff was not allowed to be in possession of the property that was seized under the institution's rules; that Plaintiff has failed to show disparate treatment; and that she is entitled to qualified immunity.

## IV.

The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F. 3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006). Importantly, the "'threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers.'" *Ctr. For Bio-Ethical Reform,* 648 F. 3d at 379 (quoting *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)).

Under this standard, the Court need not determine whether Plaintiff is a member of a suspect class, a quasi-suspect class, or merely a class of one, and, thus, what level of scrutiny should be applied to Defendant's actions,[4] unless it first concludes that Plaintiff has met her burden of showing that Defendant treated Plaintiff differently than she treated similarly-situated non-transgender inmates when she searched Plaintiff's bed area or seized some of her personal property.

---

[4] A plaintiff may bring an equal-protection claim under a "class-of-one" theory "where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). However, when a plaintiff claims that the defendant has burdened a fundamental right, or she is a member of a suspect or quasi-suspect class, courts examine the alleged actions under a heightened level of scrutiny. *Davis v. Prison Health. Servs.,* 679 F.3d 433, 441 (6th Cir. 2012). Plaintiff argues that she is a member of a protected class because she is transgender and homosexual.

Defendant argues, and the Court agrees, that Plaintiff has failed to meet this burden. In neither her verified complaint nor her affidavit does Plaintiff ever state that she was treated differently than other non-transgender, general population inmates housed in the AC Unit at RCC. Plaintiff's evidence, albeit disputed, that Defendant treated her differently after she learned that Plaintiff was transgender by "targeting" her for bed searches and disallowing property that Plaintiff had previously been allowed to keep could arguably show discriminatory intent, but it does not meet the threshold requirement of showing disparate treatment from other similarly-situated inmates.

The Court concludes that the complete lack of evidence showing that Plaintiff was treated differently than other similarly-situated inmates is fatal to Plaintiff's equal protection claim. *See*, *e.g., May v. Klee,* 915 F. 3d 1076, 1085 (6th Cir. 2019) (holding that to establish an equal protection violation, a plaintiff must establish discriminatory intent *and* differential treatment) (citation omitted); *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009) (allegation of discriminatory intent based on race must be "accompanied by some evidence that the people not disciplined were similarly situated and of a different race"); *Dodson v. Berenson*, No. 1:17-CV-327, 2017 U.S. Dist. LEXIS 196994, at *6 (N.D. Ohio Nov. 30, 2017) ("In order to state an equal protection claim, a plaintiff must first prove disparate treatment, meaning that he was treated differently from someone similarly situated to himself. *Then*, he must prove discriminatory intent, meaning that the Defendants' made their decision at least in part because they sought to discriminate based on a protected characteristic, *i.e.* race.") (citations omitted) (emphasis added); *Causey v. City of Bay City*, No. 16-cv-12747, 2017 U.S. Dist. LEXIS 180918, at *15-18 (E.D. Mich. Nov. 1, 2017) (granting summary judgment to defendants on the plaintiff's race-based equal

protection claim because the plaintiff could not point to a similarly situated non-black individual who defendants treated more favorably).

Thus, because Plaintiff has failed to satisfy her burden of showing disparate treatment, the Court will grant summary judgment to Defendant. Consequently, the Court need not address Defendant's qualified immunity argument.

V.

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (DN 19) is **GRANTED**.

Date: August 30, 2023

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: Plaintiff, *pro se*
Counsel of record
4414.011